*In re* MARRIAGE OF IRMA JEAN HOMANN, Petitioner-Appellant, and MARTIN DAN HOMANN, Respondent-Appellee.

Fourth District   No. 4—95—0484

Argued October 24, 1995.—Opinion filed November 27, 1995.

Thomas J. Logue (argued), of Glenn & Logue, of Mattoon, for appellant.

Brian L. Bower (argued), of Brainard, Bower & Kramer, of Charleston, for appellee.

PRESIDING JUSTICE KNECHT delivered the opinion of the court:

Petitioner, Irma Jean Homann, appeals from the order of the trial court denying her maintenance and ordering partition of the condominium she owned as a tenant in common with the respondent, Martin Homann. Petitioner argues, first, the trial court's order to partition the condominium contravened an agreement not to partition the property implied in an antenuptial agreement between the parties and, second, the trial court's decision denying maintenance was against the manifest weight of the evidence. We affirm.

The parties were married on March 19, 1988. Each had been married previously, and each had survived his or her former spouse. Both petitioner and respondent had children from their previous marriages. On March 18, 1988, the day before the parties were to be married, the couple entered into an antenuptial agreement. This agreement dealt only with disposition of property in the event of death of one or both of the parties. The antenuptial agreement does not refer to the possibility of divorce, the unforeseen eventuality with which we are now concerned. Both parties agree divorce was not contemplated in forming the antenuptial agreement.

Overall, the agreement evinces a scheme to keep all property separate. Any property acquired by either party during the marriage was to be treated as if it had been acquired by that party prior to the marriage. The agreement only provides if one party predeceases the other, the surviving spouse would have a life estate in the condominium, and all other property would remain separate.

The condominium, the property which the respondent sought to

have partitioned during the dissolution proceedings, was originally owned by the petitioner and her children. As part of the antenuptial agreement, respondent agreed to purchase the one-half interest in the condominium from petitioner's children. Shortly thereafter respondent purchased the one-half interest in the condominium, and the couple occupied the property as tenants in common until their separation in June 1994. Petitioner filed for dissolution on March 23, 1994, and respondent filed a complaint for partition of the condominium on August 3, 1994. Dissolution was granted, and the condominium was ordered partitioned on June 7, 1995, after a bench trial.

On appeal, petitioner argues the trial court's order partitioning the condominium violated an implied agreement in the antenuptial agreement not to partition the property. Petitioner contends an implied agreement not to partition can be found in the antenuptial agreement since each party agreed in the document to allow the other to live out his or her life in the condominium following the death of one of them. We agree with the trial court. No such agreement can be implied.

■ Generally, tenants in common have an absolute right to partition. (*Heldt v. Heldt* (1963), 29 Ill. 2d 61, 63, 193 N.E.2d 7, 8-9; *Rosenberg v. Rosenberg* (1952), 413 Ill. 343, 346, 108 N.E.2d 766, 768.) While agreements between co-tenants not to partition are valid, the facts must show a basis from which an agreement not to partition may be implied. (*Rosenberg*, 413 Ill. at 346, 108 N.E.2d at 768.) In this case, no such facts exist.

■ While there may have been an implied agreement not to partition the condominium had the parties remained married, any such agreement was impliedly conditioned on a harmonious marriage continuing until the death of one of the parties. Both parties in this case, as well as the attorney who drafted the agreement, admitted dissolution was never considered in drafting the antenuptial agreement. Both parties intended any provision of support in favor of a spouse in the event of the death of the other should be impliedly revoked by a later dissolution of the marriage. The antenuptial agreement in this case was operatively similar to a will—it operated to dispose of property in the event of death. Just as dissolution operates automatically to revoke testamentary gifts in favor of spouses under Illinois law (755 ILCS 5/4—7(b) (West 1994)), the parties to this agreement intended dissolution would impliedly revoke any provision they had made for each other in the event of one of their deaths. Finding the parties had agreed not to partition the condominium, even in the event of dissolution, would lead to a nonsensical result—both parties, if they wished to keep their interest, must live together in the condo-

minium following the dissolution of their marriage, until one of them passed away. Respondent paid a fair price ($38,500) for his interest in the condominium. Both parties admit dissolution was not contemplated in drafting the antenuptial agreement.

Petitioner also argues on appeal the trial court's denial of maintenance was an abuse of discretion and against the manifest weight of the evidence. After analyzing the evidence in light of the statutory factors set out in section 504 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/504 (West 1994)), the trial court found an award of maintenance was unwarranted. Based on the evidence disclosed at trial, the trial court's decision denying maintenance did not amount to an abuse of discretion.

At the time of trial, petitioner was 67 years old and respondent was 84. Neither party was employed at the time of trial. Petitioner had recently quit a part-time secretarial job at St. Paul's Lutheran Church (church) after the church requested she work more hours. Petitioner testified she quit work so she could travel to see her daughter in Belgium. Respondent is a farmer who retired prior to the marriage.

Both parties have considerable assets, although respondent has substantially more than petitioner. Respondent testified he received approximately $14,000 per year as income from his farm, $5,400 per year in interest, and $11,700 per year in social security. He testified he was also the beneficiary of two trusts established by his deceased wife in his favor in the amount of $16,000 per year. Respondent's financial affidavit showed some $228,000 in savings and share accounts. Respondent estimated his monthly income to be approximately $3,370. He estimated his expenses at $2,045 per month. In computing these expenses, respondent included $116 per month as gifts to his church and $1,000 per month as gifts to his children. He testified he was giving his daughter $10,000 per year as the maximum annual gift allowed by Internal Revenue Service regulations, and he further stated he gave money to his granddaughter for the care of his great-granddaughter, who had a serious medical condition.

Petitioner estimated her income to be $870 per month, most of which was social security benefits. Petitioner testified she had won $250,000 in Las Vegas shortly before her marriage to respondent. Petitioner further testified she paid $80,000 in taxes on these winnings, and spent, invested, or gave away the rest of the money. She testified she gave $10,000 to her church, $18,000 to her son to pay off an educational loan, and $25,000 to her grandchildren. Petitioner also used $16,000 of her winnings to pay off her debt on the condominium. Petitioner testified she spent $20,000 taking her husband

and family to Hawaii, $4,000 or $5,000 on new furniture, and $13,500 on a new car. She invested $31,000 with Edward D. Jones (EDJ) and $20,000 with the Lutheran Brotherhood. Finally, she purchased $4,000 worth of Coca-Cola stock.

Petitioner had access to $4,000 of the EDJ investment as a passport account. She also testified she had some $13,000 in checking accounts. She testified she owned $22,000 in other stock and had some $17,000 tied up in individual retirement accounts (IRAs) or certificates of deposit (CDs). Petitioner denied having access to some of these investments because of early withdrawal penalties but noted in her financial affidavit these investments would become accessible within a few years. She had chosen to have dividends from some of these investments automatically reinvested rather than receiving the dividends annually, and she also admitted she would have received an average of $2,700 per year in dividends last year had they not been reinvested.

Petitioner estimated her expenses to be $2,140 per month. Among these expenses she included gifts to her church of $116 per month and gifts to her family of $250 per month. Petitioner's financial affidavit also listed a $300-per-month depreciation "expense" for her car. Based upon these expenses and the structure of her income, petitioner claims a monthly shortfall of more than $1,200.

Absent an abuse of discretion, this court will not disturb a trial court's ruling as to the propriety, amount, and duration of an award of maintenance. (*In re Marriage of Albrecht* (1994), 266 Ill. App. 3d 399, 404, 639 N.E.2d 953, 957; *In re Marriage of Cheger* (1991), 213 Ill. App. 3d 371, 378, 571 N.E.2d 1135, 1140.) Where an abuse of discretion in awarding or denying maintenance is claimed, the burden of showing such an abuse rests with the claiming party. *Albrecht*, 266 Ill. App. 3d at 404, 639 N.E.2d at 957.

■ Under section 504 of the Act, a court may award maintenance after consideration of the following factors: the financial resources of both parties, the time required to acquire adequate education or training to find suitable employment, the standard of living established during the marriage, the duration of the marriage, the age and physical condition of the parties, the ability of the spouse from whom support is sought to meet both his needs and the needs of his spouse, the tax consequences of property division, and any other factor the court finds to be just and equitable. (750 ILCS 5/504(a) (West 1994).) Analysis of the evidence in this case in light of the above factors fails to show the trial court abused its discretion in denying petitioner's maintenance request. We are dealing with a marriage of relatively short duration. The parties' marriage lasted

less than seven years. Both parties had worked in the past, and both are now retired and in good health. The standard of living established by the parties during their marriage was not lavish; both parties admitted they lived frugally while married. Any change in the standard of living in this case resulted from the fortuitous spin of a slot machine by petitioner while in Las Vegas, not from any activities which can be attributed to respondent.

Petitioner stresses she should not be required to work to support herself at her age. We agree it would be unreasonable to expect petitioner to resume employment at her age in order to support herself. It is reasonable, however, for her to begin tapping her savings and investments for her support. Petitioner has approximately $17,000 in accessible checking or passport accounts and some $17,000 in IRAs and CDs—with total assets over $200,000. Petitioner should not be required to sell or otherwise impair her capital assets in lieu of maintenance, especially where respondent has sufficient assets to meet both his needs and the needs of his spouse. (See *Cheger*, 213 Ill. App. 3d at 379-80, 571 N.E.2d at 1141.) However, requiring petitioner to spend money in her checking accounts and to choose to accept income from her investments, rather than having it automatically reinvested, is not equivalent to asking her to sell or otherwise impair her assets. Moreover, petitioner indicated on her financial affidavit many of her investments will be coming due in the next several years, thereby providing her with greater income in the near future.

Nor can petitioner contend her marriage depleted her $250,000 in Las Vegas winnings. Petitioner indicated at trial she spent, invested, or gave away approximately $140,000 of her after-tax winnings, much of which is still invested in her name. The only amounts which petitioner might fairly contend were depleted by the marriage are the $4,000 to $5,000 spent on furniture and the $13,500 spent on a car which the couple used. However, this amount is negligible given both the probable financial contributions made during the marriage by the respondent and the allocation of this property in petitioner's favor during dissolution proceedings.

Petitioner's income is more substantial than it would appear at first glance, and her expenses are not such as to make the trial court's denial of maintenance an abuse of discretion. Petitioner lists gifts to church and family as expenses totalling $350 monthly. Generosity is laudable, but petitioner should not expect respondent to subsidize her gift-giving. Petitioner also claimed a $300-per-month expense for the depreciation of her car, another "expense" which makes her claimed income-expense disparity of $1,200 questionable. Petitioner admitted at trial she accumulated no debt during the period of

separation with respondent, further reinforcing the minimal nature of this disparity. Even if no debt was accumulated during this time because petitioner traveled to and lived in Belgium, all at no cost to herself, petitioner indicated she planned to travel back to Belgium often in the future. If, as petitioner herself suggested, she will again be living with, and at the expense of, her daughter in Belgium, petitioner will have extended periods of time in the near future in which she incurs little or no expenses.

Respondent has assets sufficient to support both himself and petitioner. However, as the trial court correctly noted, this alone does not justify an award of maintenance. Much of respondent's income comes from social security and from trusts established by his deceased wife. No evidence was presented at trial suggesting respondent in any way enriched himself at the expense of petitioner during their marriage. This is not a case in which the wife has foregone opportunities she might not otherwise have had to forego had it not been for the marriage. While petitioner proved respondent has the ability to pay, denial of maintenance did not amount to an abuse of discretion, given the considerable assets of petitioner.

Affirmed.

COOK and GREEN, JJ., concur.