*In re* MARRIAGE OF VIRGINIA R. SCHRIMPF, Petitioner-Appellee, and DONALD F. SCHRIMPF, Respondent-Appellant.

Fifth District    No. 5—96—0753

Opinion filed November 13, 1997.

Donald E. Groshong, of Williamson, Webster, Groshong, Falb & Gibson, of Alton, for appellant.

James R. Heil, of Alton, for appellee.

JUSTICE GOLDENHERSH delivered the opinion of the court:

Respondent, Donald F. Schrimpf, appeals from an order of the circuit court of Madison County denying his petition for the reduction or termination of maintenance. In this cause, the issues we are asked to address are (1) whether the circuit court's denial of a reduction or termination of maintenance was an abuse of discretion and/or against the manifest weight of the evidence and (2) whether respondent is entitled to a credit toward his maintenance obligation for social security benefits received by petitioner, Virginia R. Schrimpf, by virtue of contributions made by respondent. We affirm.

## FACTS

The parties originally married on September 27, 1950, and divorced for the first time on June 2, 1967. The parties remarried on October 17, 1970. Two children were born during the parties' first marriage but were emancipated by the time the second dissolution was entered on November 28, 1979. That judgment required, *inter alia*, that respondent pay petitioner $750 "per month as and for per-

manent alimony and maintenance until the respondent-counterpetitioner's death, the petitioner-counterrespondent's death, or the petitioner-counterrespondent's remarriage, whichever occurs first, commencing immediately upon entry of this Judgment." The judgment further provided, in accordance with section 502(f) of the Illinois Marriage and Dissolution of Marriage Act (the Act) (Ill. Rev. Stat. 1979, ch. 40, par. 502(f) (now 750 ILCS 5/502(f) (West 1996))):

> "[T]he terms set forth in this judgment shall not, except as to those terms relative to alimony and maintenance for the petitioner-counterrespondent, be modifiable; and *** as to such provisions relating to such alimony and maintenance, the same shall be modifiable only by way of decrease in the amount of such alimony and maintenance by reason of the economic and financial needs of respondent-counterpetitioner, it being expressly hereby provided that the amount of alimony and maintenance to be hereby awarded to petitioner-counterrespondent shall not for any cause whatever be increased above the amount provided herein."

On November 18, 1994, respondent filed a petition seeking to modify the maintenance provisions of the November 28, 1979, dissolution. Respondent alleged that a substantial and material change in circumstances occurred since the 1979 dissolution in that respondent retired after having reached the age of 66 and married his current wife, Charlene, who has significant disabilities, causing respondent to incur significant medical bills. Respondent further alleged a modification in that petitioner is able to support herself without maintenance from respondent because she owns her own home, has a vehicle, and receives social security benefits which she did not receive when the permanent maintenance order was entered in 1979. On May 20, 1996, a hearing was held on respondent's petition to modify.

Respondent testified that he was 68 years of age and that he had twice been married to petitioner. The first marriage lasted 17 years; the second lasted nine years. Respondent married his present wife on July 17, 1982. On September 1, 1995, respondent retired from Piasa Motor Fuels, where he had been employed for 48 years. Respondent's federal income tax returns showed that in 1993, his gross income was $67,912, in 1994, it was $68,954, and in 1995, the year respondent retired, it was $49,037. When the parties divorced in 1979, respondent's gross income was $42,000. In 1980, respondent's gross income increased to $56,000.

Respondent's current income consists of social security, a pension, and installment payments on a promissory note. In 1996, respondent's gross pension was $1,173.19 per month. Respondent received $1,306 in social security payments per month and $585.59

per month from the installment payments due on a promissory note from the 1987 sale of a service station. The service station was awarded to respondent as part of the 1979 property distribution. Respondent testified he was scheduled to receive the final installment in October 1999. Respondent further testified that his residential mortgage would be paid in full in 1998, resulting in a savings of almost $800 per month.

According to respondent, petitioner receives social security based upon his prior earnings. His present wife, age 56, is unemployed and has no income of her own. Charlene suffers from insulin-dependent diabetes, degenerative arthritis, and leg problems caused by an automobile accident. She underwent orthopedic surgery and fusion. Respondent testified that not all of Charlene's medical expenses are reimbursable and that in 1994 or 1995 he used his $6,500 tax refund to pay for Charlene's dental needs. Respondent submitted an affidavit itemizing his monthly expenses, which indicated that over the past six years his monthly expenses exceeded his gross monthly income by $1,674.76. Respondent estimated his expenses at $4,504.90 per month and his gross monthly income at $2,830.14. Respondent testified that he makes up the difference by drawing on reserves he has in the bank. These reserves came from the sale of a motor home. The motor home was purchased in 1994 for $84,000. In order to purchase the motor home, respondent traded in a motor home he owned and borrowed the additional $60,000 from a life insurance policy he purchased after his divorce from petitioner with proceeds he received from the sale of stock he inherited from his mother. Respondent sold the motor home $1 1/2$ years later for $64,000 because Charlene was too sick to travel. With that $64,000, respondent and Charlene purchased a lot at Lake of the Ozarks for $49,500 and put the remaining money in the bank.

As of December 1995, the life insurance policy had a cash surrender value of $125,409.17 and generated gross yearly income of $10,211.25 at an annual premium cost of $2,740. The gross value of the policy is $213,000. Respondent reinvests the interest instead of using the money. The annual premium is also paid out of the interest. Respondent admitted that he has a right to withdraw funds from this policy at any time.

Respondent also owns a Northern Life Insurance single premium policy with a net cash value of $20,851.96. Charlene and respondent's children are the beneficiaries. Respondent held a joint tenant's interest in $650 in Dreyfus Funds. Respondent's retirement and pension plan as of June 30, 1994, was valued at $427,980.10. Respondent admitted that he can change the amount of his monthly pension

income at any time. Charlene is the beneficiary of this plan. Respondent explained that if monthly benefits are increased, the survivor benefits are correspondingly decreased.

Petitioner testified to the terms of the 1979 dissolution. Petitioner was awarded the marital residence, valued at approximately $84,000 one year prior to the hearing in question. A 1974 Mercedes-Benz automobile was put in her name prior to the divorce. Petitioner still drives this vehicle. Petitioner also received household furnishings valued at $1,500 and a checking account containing $110. Petitioner testified that she owes her daughter $16,000 due to money she borrowed over the preceding 16 years in order to make ends meet and maintain her standard of living.

For 11 years following the divorce, petitioner lived on the $750 per month paid to her by respondent. Respondent also paid petitioner's heating oil bill, which ran approximately $700 per year, but he stopped doing that upon his retirement. In March 1990, petitioner began receiving $550 per month in social security based upon her former husband's earnings. Petitioner's only other income is the $35 per month which she receives in connection with renting her garage. Petitioner has been unable to save any money and does not have a savings account.

Petitioner was 70 years old at the time of the hearing. She did not work after the parties' divorce. For 10 years, from 1986 through the time of the hearing, petitioner cared for her granddaughter who has Down's syndrome. She did this as much as three times per week. Petitioner testified that she does not think she is able to work, because she gets upset if she has to hurry or do anything precisely. She is not supposed to get too hot, be in the wind, or get too tired. Petitioner suffers from a heart condition. She underwent an angioplasty procedure in 1984. Petitioner testified that she possibly could have worked after that, but she did not because she was taking care of her granddaughter.

Petitioner pays $3,000 per year for medical insurance. Her monthly expenses are $1,419 per month. This includes a figure of $100 per month for entertainment. Petitioner explained that most of this $100 goes for her annual Florida vacation, which lasts for four or five weeks. Her daughter often accompanies her on her annual trip.

Respondent's current wife, Charlene, is 56 years old. She testified that she worked for Olin Corporation for 20 years prior to her marriage to respondent. In 1969, Charlene was injured in an automobile accident caused by a drunk driver. She sustained numerous injuries, resulting in months of hospitalization. Charlene testified that her

health deteriorated after the marriage to respondent and that she now suffers from both degenerative arthritis and insulin-dependent diabetes. She is unable to drive. Respondent was aware of Charlene's medical problems when he married her and knew that she might have to quit work, which she did in October 1982. Five years later, Charlene attempted to work for a dentist but quit after three months because she could not stand for long periods of time. Charlene testified that if respondent dies, her only source of income will be his profit-sharing and life insurance.

After hearing all the evidence, the circuit court denied a reduction or termination of maintenance. Respondent filed a posttrial motion, which was also denied. Respondent now appeals.

## ANALYSIS

### I

The first issue we are asked to consider is whether the circuit court's denial of a reduction or termination of maintenance was an abuse of discretion or against the manifest weight of the evidence. Respondent contends that the trial court "was misled by and overemphasized the characterization of the original maintenance order as a 'permanent' award." Respondent contends there has been a substantial change in circumstances since the 1979 maintenance order was instituted, due to respondent's retirement and increased medical costs because of his present wife's ill health. Respondent argues that he presented evidence that his monthly expenses totaled $4,504.90 per month, while his income is substantially less than that, specifically, $1,674.76 less per month. Accordingly, respondent concludes that since he was awarded 100% of his retirement and pension interests in 1979, forcing him to withdraw substantial amounts per month in order to meet his monthly maintenance obligation is tantamount to an increase in his maintenance obligation. We disagree.

■ Section 510(a) of the Act permits the modification of maintenance upon a showing of a substantial change in circumstances. 750 ILCS 5/510(a) (West 1994). In reviewing a maintenance order, a court should consider the elements listed under section 504 of the Act, namely, the standard of living established during the marriage, the age, physical, and emotional condition of both parties, the ability of the spouse seeking maintenance to meet his or her needs independently, and the ability of the other spouse to pay. 750 ILCS 5/504 (West 1994); *In re Marriage of Breuer*, 259 Ill. App. 3d 94, 96, 630 N.E.2d 1245, 1246 (1994). Whether a spouse may rely on his retirement as a change in circumstances to justify the modification of

maintenance depends on the circumstances of each case. The relevant factors to consider include his age, health, and motives, and the timing of his ability to pay maintenance after retirement, as well as the former spouse's ability to provide for herself. *In re Marriage of Waller*, 253 Ill. App. 3d 360, 362, 625 N.E.2d 363, 365 (1993). On review, a maintenance order will not be reversed unless the record shows an abuse of discretion. *Breuer*, 259 Ill. App. 3d at 96, 630 N.E.2d at 1246. A reversal is justified only when it is obvious that the trial court acted arbitrarily or without conscientious judgment. *Breuer*, 259 Ill. App. 3d at 96, 630 N.E.2d at 1246.

In the instant case, respondent is 68 years old and petitioner is 70 years old. The parties were married for a total of 26 years. Petitioner's only sources of income are maintenance paid to her by respondent, social security, and rent paid to her for the use of her garage, for a total of $1,335 per month. Petitioner testified she has no assets beyond the marital residence awarded to her at dissolution. Petitioner did not work after the parties' second divorce. She did, however, baby-sit for the parties' granddaughter who was born with Down's syndrome.

Respondent, on the other hand, worked at the same job for 48 years, earning $68,954 during his final full year of work in 1995. When the parties divorced in 1979, respondent was earning $42,000 per year. At that time, he agreed to permanent maintenance in the amount of $750 per month. Respondent's current income consists of $1,306 per month in social security payments, $1,173.97 per month in pension, and $585.59 per month in installment payments due on the sale of a service station respondent was awarded at dissolution. The final installment is due in 1999. Respondent's mortgage on his current residence will be paid in full in 1998, leaving him with an additional $800 per month in discretionary income. Respondent's pension fund as of June 30, 1994, was valued at $427,980.10. Respondent's other assets include a life insurance policy with a cash surrender value of $125,409.17 and a second insurance policy with a cash value of $20,851.96. Respondent admitted that he could get additional funds from both his pension and the life insurance policy, should he choose to do so. Instead, respondent chooses to reinvest the interest payments made on the life insurance policy valued in excess of $125,000. Additionally, respondent and his current wife own a lot at the Lake of the Ozarks, which they bought for $49,500 upon the sale of their motor home.

■ It appears to us that respondent has substantial assets from which to pay for his current wife's medical bills and the maintenance award made in 1979. Moreover, should respondent die, Charlene will

in no way be left destitute. After reviewing the record as a whole and taking into consideration the financial resources and status of both parties, we cannot say that the denial of a termination or a reduction in respondent's maintenance payments was an abuse of discretion or against the manifest weight of the evidence.

Respondent cites *In re Marriage of Munford*, 173 Ill. App. 3d 576, 527 N.E.2d 892 (1988), as authority for the proposition that forcing respondent to withdraw additional money from his retirement account in order to meet his maintenance obligation is tantamount to an increase in his maintenance obligation. However, we do not find the facts in *Munford* applicable to the situation before us. In *Munford*, it was the former wife who filed a petition to modify, seeking an *increase* in monthly maintenance from $300 per month to $750 per month. The trial court granted the increase, mainly on the basis that petitioner did not receive sufficient assets at the time the dissolution was entered so that there was an unequal distribution of marital property due to the husband receiving his full pension and/or profit-sharing plan. The *Munford* court agreed with the former husband that the increase was actually a modification of the parties' property settlement rather than a modification of maintenance. *Munford*, 173 Ill. App. 3d at 579, 527 N.E.2d at 893.

In the instant case, petitioner was not the one seeking an increase. Instead, respondent was seeking a reduction. Respondent contends his monthly expenses exceed $4,500 per month while his income is only around $2,800 per month. However, respondent's pension is valued at over $427,000, and he has a life insurance policy valued in excess of $125,000. Respondent admitted that he can take out additional funds each month should he choose to do so. Respondent obviously planned well for his retirement, in that he was able to buy an $84,000 travel trailer and take a $20,000 loss on it less than two years later. While respondent contends that he cannot afford the $750 maintenance payment he was ordered to pay in 1979, the record establishes that he can. No issue was raised as to whether there was an equal distribution of property at the time of the parties' dissolution of marriage. Therefore, we cannot agree that *Munford* is applicable to the present situation.

## II

The other issue we must consider is whether respondent is entitled to a credit toward his maintenance obligation for social security benefits received by petitioner by virtue of contributions made by respondent. Respondent contends he is entitled to a credit and in support of this proposition cites *In re Marriage of Henry*, 156 Ill. 2d 541, 622 N.E.2d 803 (1993).

■ In *Henry*, the respondent, a divorced father of two minor children, petitioned for a downward modification of his child support obligation for his child support arrearages. The respondent contended that the social security dependent disability allowance which began to be paid to his children at the time he was found disabled, October 1987, was well in excess of his child support obligation and arrearages accrued thereon so that he should be relieved of liability for his arrearages. The trial court agreed, and the Illinois Department of Public Aid, to which the petitioner, the mother of the respondent's two children, had assigned her rights as a recipient of public aid, appealed from the trial court's determination. On appeal, the *Henry* court affirmed, noting that unlike voluntary payments which are not made for the benefit of the noncustodial parent and which are gratuitous, social security dependent disability benefits are not gratuitous. They are generated by the noncustodial parent through labor and earnings and replace support the child loses upon the disability of the wage earner responsible for child support. 156 Ill. 2d at 551, 622 N.E.2d at 808-09. Because social security dependent disability benefits are earned by the noncustodial parent, or made on behalf of such parent, and are paid at least in part with contributions from the noncustodial parent's own earnings, the *Henry* court concluded that payment of such benefits satisfies the noncustodial parent's support obligation. 156 Ill. 2d at 552, 622 N.E.2d at 809. We find *Henry* distinguishable from the case at bar for numerous reasons, including but not limited to the following. First, *Henry* involved social security dependent disability benefits, whereas the instant case concerns social security old age insurance benefits. Second, the *Henry* court was concerned with child support payments, whereas we are concerned with an award of permanent maintenance. Third, *Henry* involves a petitioner who assigned her rights as a recipient of public aid. There was no such assignment here.

Social security dependent disability benefits are obviously much different than social security old age insurance benefits. Virtually no one plans to become disabled and luckily the percentage of workers who become disabled is low. On the other hand, assuming a worker lives long enough, it is inevitable and foreseeable that he will retire. When respondent and petitioner reached their settlement in 1979, respondent certainly planned to retire at some point. Respondent planned well enough to amass over $427,000 in a pension plan by 1996. This was over and above contributions he made to the Social Security Administration. The 1979 judgment of dissolution provided that respondent pay petitioner $750 "per month as and for permanent alimony and maintenance until the respondent-

counterpetitioner's death, the petitioner-counterrespondent's death, or the petitioner-counterrespondent's remarriage, whichever occurs first." The order made no provision for a reduction in maintenance once petitioner began receiving social security benefits.

Respondent is entitled to *both* a pension and social security benefits. Likewise, we believe that petitioner should receive *both* social security and maintenance. Petitioner receives only $550 per month in social security benefits and $750 per month in maintenance. She appears to be able to survive in modest comfort on this amount, but a reduction of $550 per month would certainly cause her substantial hardships. Moreover, the record reflects that respondent is still able to afford to make the $750 payment as ordered in 1979. As previously stated, we find *Henry* distinguishable from the case at bar. Accordingly, we do not find that respondent is entitled to a credit toward his maintenance obligation for social security benefits received by petitioner by virtue of contributions made by respondent.

For the foregoing reasons, the judgment of the circuit court of Madison County is affirmed.

Affirmed.

KUEHN, P.J., and HOPKINS, J., concur.